**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.: 1:14-cv-20061-KMW/Becerra

LUIS GUSTAVO DEL VALLE,

     Movant,

v.

FLORIDA DEPARTMENT OF
CORRECTIONS, *et al.*,

     Respondents.

_____/

**REPORT AND RECOMMENDATION[1] ON LUIS GUSTAVO DEL VALLE'S**
**PETITION FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254**

**THIS CAUSE** came before the Court upon Luis Gustavo Del Valle's ("Petitioner" or "Del Valle") Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 ("Petition"). ECF No. [1]. Petitioner filed a Memorandum of Law in Support of Petition for Writ of Habeas Corpus. ECF No. [51]. Respondent, Secretary of the Florida Department of Corrections, filed its Response to the Petition, ECF No. [54], and Del Valle filed his Reply, ECF No. [55]. Therefore, the Petition is ripe for disposition. After careful review of the Petition, the relevant authorities, the record, and for the reasons discussed below, it is hereby **RECOMMENDED** that the Petition be **GRANTED IN PART AND DENIED IN PART**.

    **I.**    **BACKGROUND**

       **A.  The Underlying Criminal Case Against Del Valle**

This case stems from a "drug rip." ECF No. [54] at 3. Shortly before midnight on August 18, 2005, Leo Dan Gonzalez and his friend, John McGill, drove to a location near Goodlet Park in

---

[1] The Honorable Kathleen M. Williams, United States District Judge, referred this matter for disposition. ECF Nos. [21], [56].

Hialeah, Florida, intending to sell cocaine to Lisbet Carvajal.  *Id*.  When Gonzalez and McGill arrived, Carvajal approached their car on the passenger side.  *Id*.  While Carvajal was standing by the car, several assailants walked towards them, and Carvajal fled.  *Id*.  While Carvajal was fleeing, she heard a single gunshot, which mortally wounded Gonzalez.  *Id*.  A police investigation into Gonzalez's homicide ensued.  *Id.*

### B.  The Police Investigation Into The Homicide

Following Gonzalez's homicide, the Hialeah Police Department suspected that the crime might have been gang-related.  *Id*. at 7.  A detective in the Hialeah Gang Investigation Unit, Gordon Spitler, was told that the homicide possibly involved members of the Hillside Gangsters.  *Id*. at 9.  In the evening of August 19, 2005, Detective Spitler saw Del Valle walking down the street late with his girlfriend, Lasserole Perez.[2]  *Id*. at 8–9.  Detective Spitler knew Del Valle from Del Valle's association with the Hillside Gangsters[3] and he believed that as a member of the Hillside Gangsters, Del Valle might have information about Gonzalez's homicide.  *Id*. at 9.

Detective Spitler stopped and asked Del Valle if he would take a ride with him to talk to a detective at the police station.  *Id*.  Detective Spitler told Del Valle that after he spoke with detectives at the police station he would be allowed to go home.  *Id*.  Detective Spitler conceded that he did not have probable cause to arrest Del Valle at that time.  *Id*.  Del Valle and his girlfriend got in the detective's unmarked car, and Detective Spitler took them both, unhandcuffed, to the Hialeah Police Department.  *Id*. at 7, 9.  Del Valle, who was born on August 13, 1987, was just five days into his eighteenth birthday when the homicide occurred.  ECF No. [51] at 2.

---

[2] Although some portions of the record refer to Del Valle's girlfriend as Lasserole Perez, other parts of the record refer to her as Lazara Parets.

[3] At the time of the incident, the Hillside Gangsters had broken off into two fractures, and Del Valle was a member of one of those factions—Grimmey People.  ECF No. [54] at 8.

Once at the Hialeah Police Department, Detective Carlos Arango met Del Valle in Detective Hart's office at 12:30 a.m.  ECF No. [54] at 7, 9.  During Del Valle's interview, his girlfriend remained in another detective's office.  *Id*. at 7.  Detective Arango introduced himself to Del Valle as the detective in charge of a homicide investigation.  *Id*. at 9.  Detective Arango advised Del Valle that he was a suspect and administered *Miranda* warnings.  *Id*.  In a lengthy unrecorded conversation that lasted approximately three hours, Del Valle specifically denied any involvement in Gonzalez's homicide and indicated that he would not discuss anything related to the homicide.  *Id*. at 10.  Del Valle, however, told Detective Arango that he was willing to look at photographs and advise Detective Arango if he knew the persons in the photographs.  *Id*.

Detective Arango then showed Del Valle photographs of Hillside Gangsters members, which included photographs of individuals who were suspects in the homicide.  *Id*.  Specifically, Detective Arango showed Del Valle seven photographs.  *Id*.  As Del Valle was shown each photograph, Del Valle was directed to write on the photograph whether he knew the person and to sign each photograph.  *Id*.  Del Valle indicated that he knew Cesar Hernandez, Surgio Hooker, and Lasserole Perez—his girlfriend.  *Id*.  Del Valle, however, denied knowing Juan Carlos Atanache, Jorge Gomez, Larry Perez, and Ricberto Lebraya.  *Id*.

After this preliminary interrogation, Del Valle agreed to give a recorded statement regarding what he had discussed with Detective Arango.  *Id*.  The recording began at 3:36 a.m. *Id*.  After several minutes of the taped discussion, Del Valle stated that he did not want to speak anymore.  *Id*. at 11.  Specifically, the following exchange took place between Del Valle and Detective Arango:

Q. Okay.

A. Now I'll tell you what I know.

Q. Are there, I'm sorry?

A. (speaking too low.)

Q. No, we're going, we're going over all the papers and then we'll get to that.  What other papers do I have.  Earlier today we looked at a group of photographs, and I showed you this photo and is that your signature at the bottom of that photo?

A. Yes.

Q. And above that photo, what does that say?

A. I don't know.

Q. I don't know him.  And, did you write that in there yourself?

A. Yeah.

Q. Okay. And, did I initial there next to the picture after you?

A. Yeah.

Q. For the record, that is a photograph of Juan Carlos Etanche (Phonetic)?  I also showed you this second photo, and is that your signature at the bottom of that photo?

A. Ah.

Q. Did you

A. Pause it for a second so I can tell you something.

Q. You can tell me something, go ahead.

A. I don't want to speak no more. I had told you before on this tape.

Q. So you don't want to talk to me about if this is your signature or not?

A. Yeah, that's my signature.

Q. Okay.

A. I don't want to speak no more.

Q. See, now I'm the one that needs a little explanation. What I'm going through right now is simply to verify that the different signatures on these pieces are yours.

A. I know.

4

Q. We can do that all at once, or, we can do them one at a time. However you feel more comfortable.

A. Ah.

Q. I know that you don't want to talk about the facts of the case, and I told you I'd give you the opportunity to do that now. So, you know, that's fine, we won't go that far. But is it okay to just verify the signature on these papers? You're shaking your hand, your head?

A. No.

Q. No?

A. I don't want to speak no more.

Q. Okay, so this will conclude the statement given by Luis Gustavo Del Valle, who no longer wants to talk about this case and does not want to continue going over the forms that we reviewed earlier. The time now is 3:43 A.M. and the date is August 20th, 2005. And this concludes the recording.

ECF No. [13-3] at 52:3–54:9.

After the recording was stopped, Detective Arango asked Del Valle if he was all right, and Del Valle told him that he wanted to think about what he wanted to say.  ECF No. [54] at 12. Detective Arango then told Del Valle that he was going to speak with his girlfriend and asked Del Valle if he did not mind waiting in the office while he spoke with her.  *Id*.  Del Valle agreed and waited in the office.  *Id*.  Detective Arango went to a different room and spoke with Lasserole Perez between 4:10 a.m. and 5:20 a.m.  *Id*. at 12–13.  Detective Arango took Lasserole Perez's recorded statement from 5:06 a.m. to 5:20 a.m., and during that time he obtained information in furtherance of his investigation.  ECF No [13-3] at 58:13–25.  After concluding his interview with Lasserole Perez, Detective Arango testified that he "went back to the office [where] Luis Del Valle was, and [] informed him [that he] finished speaking to his girlfriend."  *Id.* at 59:1–5.  According to Detective Arango, at that point Del Valle said he wanted to tell Detective Arango what happened.  ECF No. [54] at 13.  Del Valle spoke with Detective Arango from 5:30 a.m. to 6:18

a.m. and gave a second recorded interview that ended at 6:58 a.m. *Id*. During that second recorded statement, Del Valle admitted to participating in the robbery that resulted in Gonzalez's death on August 18, 2005. *See id*. at 8.

On March 16, 2006, Del Valle and three co-defendants—Juan Carlos Atanache, Jorge Gomez, and Larry Perez—were indicted on: (1) one count of first-degree murder with a deadly weapon, under section 782.04(2), Florida Statutes (2005); (2) two counts of armed robbery with a firearm while wearing a hood or mask—a felony of the first degree under section 812.13(2)(A), Florida Statutes (2005); and (3) one count of armed carjacking—a felony of the first degree under section 812.133(2)(A), Florida Statutes (2005). ECF Nos. [54] at 6–7; [13-9] at 4.

### C.  Del Valle's Motion to Suppress

Prior to trial, Del Valle filed a Motion to Suppress the confession that he gave detectives. *Id*. at 8. The trial court held an evidentiary hearing on the Motion to Suppress on March 31, 2008. *Id*. At the hearing, the State first called Detective Spitler. ECF No. [13-3] at 14:22–15:1. Detective Spitler testified that in August 2005, he was contacted about a homicide possibly involving the Hillside Gangsters. *Id.* at 17:14–25. Detective Spitler explained that, at the time, it was his job to identify gang members by picture, speak with gang members, identify what gang they were part of, and keep "tabs on what everybody [was] doing." *Id.* at 18:13–21. Detective Spitler stated that he had documented a picture of Del Valle and had identified that he was a member of "Grimmey People," who had broken off from the Hillside Gangsters. *Id.* at 18:22–19:9. Detective Spitler testified that that day after the homicide, while he was canvassing the area, he encountered Del Valle who was walking down the street with his girlfriend. *Id.* at 17:19–25, 19:19–20:18. Detective Spitler asked Del Valle if he was willing to take a ride in his car, uncuffed. *Id.* at 21:10–11. Del Valle agreed and he sat in the passenger seat of Detective Spitler's unmarked vehicle while his girlfriend sat in the back seat. *Id.* at 21:12–22:8. Although Detective Spitler was

6

not in uniform, he testified that he was wearing his badge and had a gun and that Del Valle and his girlfriend were aware that he was a police officer. *Id.* at 22:11–24. Detective Spitler told Del Valle that his stay at the police station would be a "quick thing." *Id.* at 26:1–13. Upon arriving at the police station, Del Valle's girlfriend sat on a couch and Del Valle sat in Sergeant Hart's office until Detective Arango arrived. *Id.* at 23:14–19. Detective Spitler did not speak with Del Valle or his girlfriend again that night. *Id.* at 27:6–11.

The State then called Detective Arango. *Id.* at 28:15–29:16. Detective Arango testified that he made contact with Del Valle on August 20, 2005, at 12:30 a.m. in Sergeant Hart's office. *Id.* at 30:13–31:15. Detective Arango informed Del Valle that he was a suspect in an investigation and that he needed to speak with him. *Id.* at 32:18–23. Detective Arango testified that he read Del Valle his *Miranda* rights and that Del Valle executed a waiver form. *Id.* at 32:18–38:4. Detective Arango testified that he had a "lengthy conversation" with Del Valle off tape. *Id.* at 39:6–9. During this time, Del Valle denied any involvement with Gonzalez's the homicide, any of the suspects involved in the homicide, and the victim of homicide. *Id.* at 39:10–25.

Detective Arango testified that he started a recorded conversation with Del Valle at approximately 3:30 a.m. *Id.* at 46:4–14. Detective Arango asked Del Valle several preliminary questions, including his name, address, age, education level, whether he was taken to the station on his own free will, and whether he was read his *Miranda* rights. *Id.* at 47:7–52:3. As Detective Arango was about to review the photographs of the suspects he had shown Del Valle off tape, Del Valle stated three times that he did not want to speak anymore. *Id.* at 52:3–54:9. The recording only lasted seventeen (17) minutes, until 3:43 a.m. *Id.* at 55:15–19. Detective Arango testified that when Del Valle stated that he did not want to speak anymore, he sought clarification because before commencing the recording they had agreed that they would only discuss the photographs of the suspects and not the homicide portion of the case. *Id.* at 54:17–55:9. Detective Arango

7

testified that once the recording stopped, he asked Del Valle "if he was all right," to which Del Valle responded that "he just wanted to think about what he wanted to say." *Id.* at 55:20–24. In response, Detective Arango told Del Valle that he "was going to go speak with his girlfriend" and verified that Del Valle would not mind waiting in the office in the meantime. *Id.* at 55:24–56:3. Detective Arango stated that while he spoke with Del Valle's girlfriend, Del Valle was not handcuffed but there was another individual watching over Del Valle. *Id.* at 56:4–9. Detective Arango testified that his conversation with Del Valle's girlfriend began at 4:10 a.m. and that they had a recorded conversation from 5:06 a.m. until 5:20 a.m. *Id.* at 58:2–19. Detective Arango affirmed that he obtained information during the conversation with Del Valle's girlfriend. *Id.* at 58:23–25. After concluding that interview at 5:30 a.m., Detective Arango "went back to the office [where] Luis Del Valle was, and [Detective Arango] informed him [that he] finished speaking to his girlfriend." *Id.* at 59:1–7. Detective Arango testified that Del Valle then said that he wanted to tell him "what had happened." *Id.* at 59:12–16. Detective Arango and Del Valle spoke off tape from 5:30 a.m. until 6:18 a.m., and Detective Arango took Del Valle's recorded statement from 6:18 a.m. until 6:58 a.m., wherein Del Valle made exculpatory statements implicating himself in Gonzalez's homicide. *See id.* at 60:6–17. Detective Arango testified that Del Valle was not re-advised of his *Miranda* rights. *Id.* at 72:21–73:3.

Del Valle's counsel argued that the exculpatory statements should be suppressed under *Michigan v. Mosley*, because although Del Valle invoked his right to remain silent three times, there was no immediate cessation of interrogation, the continued interrogation concerned the same offense, the continued interrogation occurred in the same location, there was no significant gap between the invocation and the re-initiation of questioning, Del Valle was not re-advised of his *Miranda* rights, and it was not Del Valle who re-initiated the conversation rather it was Detective Arango. *Id.* at 75:23–79:9.

In response, the State argued that although Del Valle invoked his right to remain silent, Detective Arango's questions were merely for the purpose of clarification. *Id.* at 79:11–21. Moreover, the State argued that when Detective Arango returned to Del Valle after speaking with his girlfriend, it was Del Valle who re-initiated contact with Detective Arango by stating that he wanted to speak about the case. *Id.* at 80:13–20.

After hearing argument from counsel, the trial court ruled that Del Valle's exculpatory statements were admissible, as follows:

> Okay. I am not happy with Detective Arango not [ceasing] to question the defendant after I think he had agreed the defendant to talk about the photos and was not talking about the facts. I believe he gave good Miranda warning. The defendant was put on notice. The defendant understood them and invoked them. And he [chose] to and nobody forced him. He was there. He could have left.
>
> Although he's just 18, he's a big boy. The girlfriend was there. He didn't say I spoke to your girlfriend and told me everything. There was nothing asked of the defendant or offered.
>
> I think it was free and voluntarily. The defendant was credible. I don't have reason to believe it's not true the defendant initiated the second statement and that he was warned of his Miranda warnings at the beginning. So I'm going to allow the statement to come in.
>
> Okay, so the motion is denied.

*Id.* at 86:14–87:7.

### D. The Trial

On April 1, 2008, Del Valle's jury trial commenced. ECF No. [12-4] at 1. Two of Del Valle's co-defendants, Atanache and Perez, entered into cooperation agreements with the State of Florida that provided substantially reduced sentences, and testified against Del Valle at trial.[4] *See*

---

[4] Although Gomez also agreed to cooperate with the State, he did not testify at trial. ECF No. [13-9] at 5 n.1.

ECF No. [51] at 2–3.  The evidence against Del Valle at trial consisted of the testimony of the cooperating co-defendants and the incriminating statements Del Valle gave to the police.  *Id.*

Larry Perez testified that on the night of the robbery, he met Del Valle at his house between 8:00 p.m. and 9:00 p.m.  ECF No. [54] at 3.  Del Valle told him that "there was something that they could do to make money."  *Id.* (alterations adopted).  From Del Valle's house, Perez, Del Valle, and Del Valle's girlfriend, Lazara Parets, "drove around" in Perez's car and discussed "what was going to happen."  *Id.* at 3–4.  During this time, Del Valle asked Perez to get his guns—a .45 Sig Sauer and a .38 Special.  *Id.* at 4.  Perez dropped off Del Valle at his home so he could retrieve his gun, a Colt .45, and Del Valle's girlfriend got out of the car.  ECF No. [12-5] at 19:22–20:2. While Del Valle was at his home, Perez went inside his house to get his guns.  *Id.* at 20:3–10. Perez then picked up Del Valle.  *Id.* at 20:11–14.  After picking up Del Valle, Perez picked up Gomez.  *Id.* at 20:15–17.  And finally, Perez picked up Atanache and Carvajal.  *Id.* at 20:18–21. The men then drove to Goodlet Park, arriving there at approximately 10:00 p.m.  *Id.* at 20:25– 21:1, 22:22–24.

While at the playground at Goodlet Park, Carvajal made "a couple" of phone calls.  ECF No. [54] at 4.  After waiting at the playground for some time, Atanache and Del Valle walked toward the fence surrounding the park to speak with some individuals that they recognized.  *Id.* After the individuals by the fence departed, Gonzalez and McGill arrived.  *Id.*  According to Perez, all co-defendants had their faces covered with bandanas.  ECF No. [12-5] at 36:18–37:7.  They scaled the fence, pulled out their guns,[5] and approached the car where Gonzalez and McGill were. *Id.* at 37:8–38:4.  Perez testified that Del Valle approached the driver's side of the car, and that Perez went to the passenger's side.  *Id.* at 38:5–17.  Carvajal "took off."  *Id.* at 38:18–24.  At the

---

[5] Except Atanache, who did not have a gun.  ECF No. [12-5] at 38.

car, Perez ripped off McGill's chain at gunpoint and demanded that he exit the car. ECF No. [54] at 4–5. Perez then went to the driver side to encourage De Valle to "hurry up." *Id*. at 5. Perez testified that he saw Del Valle fire once at Gonzalez. *Id.*

Atanache also testified at trial. ECF No. [54] at 5. Atanache testified that he met with Gomez and Del Valle near Florida National College sometime between 3:00 p.m. and 7:00 p.m. *Id*. At that time, according to Atanache, Del Valle claimed that he "had a plan to rob somebody." *Id*. Atanache admitted that he kicked McGill "like a soccer ball" until he lost consciousness. *Id*. at 6. Atanache also testified that he saw Del Valle shoot Gonzalez while Gonzalez was "face down" on the ground. *Id*.

Finally, McGill testified at the trial. *Id.* According to McGill, he recalled that several people wearing "all black" ran to the car when they arrived at Goodlet Park. *Id.* at 6. Two people went to his side. *Id*. A gun was then put to his neck and his chain was torn off. *Id*. When McGill ultimately exited the car, "everything was blurry," and shortly thereafter, he "blacked out." *Id*.

On April 4, 2008, the jury returned a verdict finding Del Valle guilty of first-degree murder (Count 1), armed robbery with a firearm or deadly weapon (Counts 2–3), and carjacking (Count 4). ECF No. [13-2] at 126–29. Although the jury found that Del Valle "possessed a firearm" as to all counts, the jury did not find—contrary to the State's position at trial—that Del Valle "discharged a firearm." *Id*. Del Valle was sentenced to life imprisonment with a life minimum mandatory for the murder and a ten-year minimum mandatory for the carjacking. ECF No. [54] at 15. One of Del Valle's co-defendants, Larry Anthony Perez, entered into a plea agreement with the State and was sentenced to fifteen years of imprisonment. ECF Nos. [12-4] at 142:20–145:8; [51] at 2. Moreover, the two other co-defendants, Juan Carlos Atanche and Jorge Gomez, also entered into a plea agreement and were sentenced to twelve years of imprisonment. ECF Nos. [12-6] at 98:20–107:16; [51] at 2.

### E.  The Direct Appeal

Following his conviction, Del Valle appealed to the Florida Third District Court of Appeal. *Del Valle v. State*, 17 So. 3d 846, 846 (Fla. 3d DCA 2009).  The only issue before the Third District was whether the trial court erred by denying the Motion to Suppress Del Valle's confession.  *Id*. The Third District rejected Del Valle's argument that his invocation of the right to terminate questioning was not scrupulously honored within the meaning of *Michigan v. Mosley*, 423 U.S. 96 (1975). *Id.*  The Third District distinguished the facts in Del Valle's case from the facts in *State v. Brown*, 592 So.2d 308 (Fla. 3d DCA 1991)—a case relied on by Del Valle.  *Id.*  The Third District found that the conduct of the detective in Del Valle's case was distinguishable from the officer's conduct in *Brown*, where the officer continued to discuss the case, outlined the state's evidence against the defendant, and left the defendant handcuffed in an interrogation room for an hour and a half after the defendant invoked his right to silence and requested counsel.  *Id*.  The court found that the detective in this case engaged in no such conduct.  *Id*.  The court noted that after the questioning of Del Valle ceased, Del Valle remained in the detective's office and was not handcuffed while the detective spoke with Del Valle's girlfriend in an adjacent office.  *Id*.  The court noted that the trial court credited the detective's testimony that, upon returning to tell Del Valle that the questioning of his girlfriend was completed, Del Valle initiated the conversation with the detective and stated that he wanted to tell the detective what happened.  *Id*.  The court, therefore, affirmed the trial court's decision to deny Del Valle's Motion to Suppress his confession. *Id*.

### F.  The State Post-Conviction Proceedings

On September 4, 2009, Del Valle, through his counsel, filed a Motion for Rehearing or Certification of Conflict with the Third District.  ECF No. [13-7].  Specifically, Del Valle argued that the Third District's decision was in conflict and could not be reconciled with the Fourth

District Court of Appeal's decision in *Glover v. State*, 677 So. 2d 374 (Fla. 4th DCA 1996). *Id*. at

2. According to Del Valle, *Glover* was instructive because there, similar to Del Valle's case, the

"incriminating statements were not [made] in response to express questioning by a detective but

rather resulted from the detective's 'unduly protracted and evocative' actions." *Id*. at 3 (citing

*Glover*, 677 So.2d at 376). Del Valle argued that because the police conduct in his case was

substantially more protracted and evocative than in *Glover*—where the Fourth District reversed

the appellant's conviction because his statements to the police were made under circumstances

that should have been suppressed—a certification of conflict was appropriate. *Id*. at 4. On

September 17, 2009, the Third District issued a one-sentence order, denying Del Valle's Motion

for Rehearing or Certification of Conflict. ECF No. [13-8]. The Third District did not issue any

further decision on the merits of Del Valle's claim. *Id.*

On October 21, 2009,[6] Del Valle filed a Notice seeking the discretionary jurisdiction of the

Florida Supreme Court. ECF No. [54] at 17. Del Valle argued that the Florida Supreme Court

should exercise its discretionary jurisdiction to review the denial of Del Valle's conviction for first

degree murder by the Third District because that decision was in conflict with the Supreme Court's

decision in *Cuervo v. State*, 967 So. 2d 155, 166 n.10 (Fla. 2007). ECF No. [13-9] at 9. Del Valle

argued that although he was interrogated by the same detective at the same location concerning

the same offense, he was not—like the defendant in *Cuervo*—given a fresh set of *Miranda*

warnings. *Id*. at 12. On May 26, 2010, the Florida Supreme Court declined to accept jurisdiction

and denied review on the merits. ECF No. [13-11]. The Florida Supreme Court did not issue any

decision on the merits of Del Valle's claim. *Id.*

---

[6] Del Valle's initial brief invoking the Supreme Court's jurisdiction states that Del Valle's Notice
to Invoke the Discretionary Jurisdiction of the Florida Supreme Court was filed on October 16,
2009. ECF No. [13-9] at 7.

On May 25, 2011, Del Valle filed a *pro se* Post-Conviction Motion pursuant to Florida Rule of Criminal Procedure 3.850.[7]  ECF No. [13-12] at 4.  Del Valle's Post-Conviction Motion raised four grounds asserting ineffective assistance of trial counsel regarding Del Valle's interrogation and the Motion to Suppress.  *Id*. at 9–34.  On September 19, 2011, the trial court held an evidentiary hearing on Del Valle's Post-Conviction Motion.  *Id*. at 73.  During the evidentiary hearing, defense trial counsel testified and was specifically questioned as to each ground raised in Del Valle's Post-Conviction Motion.  *Id*. at 73–75.

Following the evidentiary hearing, on October 7, 2011, the trial court issued its order, which was dated September 19, 2011, denying Del Valle's Post-Conviction Motion.  *Id*. at 75–76.  The trial court found that Del Valle failed to show his counsel was ineffective.  *Id*. at 75.  The trial court explained that trial counsel made a strategic decision based on witness credibility and made arguments he felt he could make given the circumstances.  *Id*.  The trial court further explained that although Del Valle argued that his girlfriend's testimony and his own testimony would have made a difference at the suppression hearing, the trial court was not persuaded by that argument.  *Id*.  The trial court "was aware of the length of the interrogation, that [Del Valle's] girlfriend was being questioned, the age of the defendant, and that the defendant was being observed the entire five hours at the station."  *Id*.  According to the trial court's order, "[t]he outcome of the case would not have been different."  *Id*.

On November 7, 2011, Del Valle appealed *pro se* the trial court's order denying his Post-Conviction Motion.  *Id*. at 81.  Del Valle's appeal raised the same claims as his Post-Conviction

---

[7] The date when Del Valle's Post-Conviction Motion was filed is unclear because the certificate of service in the motion does not indicate the date that the motion was handed to prison officials. Indeed, Del Valle's Post-Conviction Motion is not dated.  Although del Valle contends that he filed his Post-Conviction Motion on May 25, 2011, Respondent notes that the state court record on appeal indicates that Del Valle's Post-Conviction Motion was filed on June 8, 2011.  ECF No. [54] at 18 n.3.

Motion.  *See* ECF No. [13-13].  On July 31, 2013, the Third District affirmed the trial court's ruling

on Del Valle's Post-Conviction Motion.  *Del Valle v. State*, 119 So. 3d 451 (Fla. 3d DCA 2013).

The Third District's Mandate was issued on September 11, 2013.  ECF No. [13-17].

Following the Third District's denial of his Post-Conviction Motion, Del Valle filed a *pro
se* Motion for Extension of Time to File Motion for Rehearing.  *See* ECF No. [13-16].  The Third

District granted Del Valle's Motion for Extension of Time to File Motion for Rehearing, and gave

Del Valle until September 7, 2013, to file his motion.  *Id*.  On September 10, 2013, Del Valle filed

his Motion for Rehearing.  ECF No. [13-18].  On October 4, 2013, Del Valle's Motion for

Rehearing was denied by the Third District.  ECF No. [51-1] at 5.

## II.    THE INSTANT PETITION

Del Valle filed his initial petition under 28 U.S.C. § 2254 by a person in custody pursuant

to a state court judgment ("Initial Petition") raising five arguments: (1) that the Third District erred

in unreasonably applying the facts to the law regarding the Motion to Suppress, and thus

incorrectly affirmed the trial court's denial of the Motion to Suppress; (2) that the trial defense

attorney was ineffective for failing to call Del Valle to testify regarding the voluntariness of his

confession or the conditions of his confinement and the interrogation that led to his confession; (3)

that the trial defense attorney was ineffective for failing to call Del Valle to testify regarding his

own perception of his detention; (4) that the trial defense attorney was ineffective for failing to

call Lazara Parets to testify about the circumstances of her and Del Valle's detention, which would

have impeached the detective's testimony; and (5) that the trial defense attorney was ineffective

for failing to call Del Valle to testify regarding his own perception of whether he was free to leave.

ECF No. [1-1] at 3–5, 7–8, 10–11, 13–15, 17.

Del Valle then filed a *pro se* motion requesting leave to amend the Initial Petition to submit

two additional grounds ("Motion to Amend Initial Petition").  ECF No. [23].  Del Valle wanted to

add the additional argument that trial defense counsel was ineffective for failing to request an independent act jury instruction and pursue an independent act defense. *Id*. at 2–5. Del Valle also wanted to submit a manifest injustice claim based on his sentence to life in prison while his three co-defendants all received sentences of fifteen years in prison or less. *Id*. at 5–8.

The Court granted Del Valle's Motion to Amend Initial Petition.[8]  ECF No. [26].  On August 13, 2015, Del Valle filed a Memorandum of Law Supporting Amended Habeas Corpus, which included the two additional claims. ECF No. [28].  Respondent filed an Amended Response. ECF No. [33].

Del Valle's newly retained counsel, Daniel Tibbitt, entered a Notice of Appearance.  ECF No. [41].  That same day, Del Valle's counsel filed a Motion to Stay requesting that the matter be stayed for sixty days to allow counsel to adequately review the case.  ECF No. [42].  The Court granted the Motion to Stay, stayed the matter until further order from the Court, and denied without prejudice all pending motions.  ECF No. [45].

Del Valle filed a Motion to Reopen Case.  ECF No. [52].  The Court granted Del Valle's Motion to Reopen Case and instructed the Clerk of the Court to reopen the case.  ECF No. [53] at 2.  The Court also entered a briefing schedule regarding Del Valle's Petition.  *Id*.

Del Valle's Memorandum of Law in Support of Petition for Writ of Habeas Corpus explains that seven grounds have been raised in connection to Del Valle's Petition.[9]  ECF No. [51].

---

[8] The Court's Order stated that it was "not intended to constitute a ruling regarding the timeliness or the merits of the additional claims." ECF No. [26].

[9] According to Del Valle's Memorandum, the seven grounds are that: (1) the state court unreasonably applied the facts to the law in denying Del Valle's Motion to Suppress; (2) the trial defense attorney was ineffective for failing to call defendant to testify as to the voluntariness of his confession at the suppression hearing; (3) the trial defense attorney was ineffective for failing to call defendant to testify as to his perception concerning his custody at the police station; (4) the trial defense attorney was ineffective for failing to call Lazara Perets to testify at the suppression hearing; (5) the trial defense attorney was ineffective for failing to investigate and raise the issue of the defendant being "unlawfully seized" and to call him in support of this contention; (6)

16

However, for the sake of simplicity, Del Valle's Memorandum treats the grounds that relate to defense trial counsel's failure to call Del Valle at the Motion to Suppress hearing, as one. *Id*. at 35. Therefore, Del Valle's Memorandum explains that there are essentially five grounds to Del Valle's Petition: (1) the state court unreasonably applied the facts to the law in denying the Motion to Suppress; (2) defense trial counsel was ineffective for failing to call Del Valle at the Motion to Suppress hearing; (3) defense trial counsel was ineffective for failing to call Lazara Parets at the Motion to Suppress hearing; (4) defense trial counsel was ineffective for failing to investigate and pursue an independent act defense; and (5) Del Valle's life in prison sentence is a manifest injustice because more culpable co-defendants were given significantly lesser sentences.[10] *Id*. at 35–36.

Thereafter, Respondent filed its Response to Del Valle's Petition. ECF No. [54]. Subsequently, Del Valle filed his Reply. ECF No. [55]. Finally, following the undersigned's assignment to the instant matter, the undersigned held a status hearing on Del Valle's Petition, ECF No. [59], and oral argument was held on the matter on October 5, 2021, ECF No. [66].

## III.     STANDARD OF REVIEW

Del Valle's federal habeas petition is governed by 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). "Under § 2254(d), a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits of the issue was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable

---

(amended ground) defense trial counsel was ineffective for failing to investigate and pursue an independent act defense; and (7) (amended ground) Del Valle's life in prison sentence is a manifest injustice because more culpable co-defendants were given significantly lesser sentences. ECF No. [51] at 35.

[10] Although Del Valle's Memorandum includes the ground regarding manifest injustice, Del Valle's counsel states that he "does not see a good faith argument" as to this point. ECF No. [51] at 69–70. Therefore, the undersigned does not consider this ground of Del Valle's Petition.

determination of the facts in light of the evidence presented in the state court proceeding." *Lumpkins v. Sec'y Dep't of Corr.*, 449 F. App'x 879, 883 (11th Cir. 2011) (citing 28 U.S.C. § 2254(d)). Indeed, under the AEDPA, "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 132 S.Ct. 26, 27 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, the Court cannot grant relief unless Del Valle shows that "no fairminded jurist could agree with that [state] court's decision." *See id.*

"[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis omitted). Indeed, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. "The Supreme Court repeatedly has admonished that 'the petitioner carries the burden of proof' and that the § 2254(d)(1) standard is 'a difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Lumpkins*, 449 Fed. App'x at 883 (alterations adopted) (quoting *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011)).

## IV.    ANALYSIS

The undersigned first addresses the timeliness of Del Valle's Petition. Specifically, because Del Valle filed an Initial Petition (Grounds 1–3) and an Amended Petition (Grounds 4–5) on different dates, the undersigned analyzes the timeliness of each Petition individually. The undersigned finds that Del Valle's Initial Petition was timely filed. However, Del Valle's Amended Petition was not timely filed.

As to the merits of Del Valle's Petition, the undersigned finds that the state courts' denial of Del Valle's Motion to Suppress was contrary to federal law as determined by the Supreme Court of the United States. Specifically, the state courts erred because Detective Arango impermissibly re-initiated Del Valle's interrogation after he had invoked his right to remain silent three times. Finally, the undersigned finds that Del Valle's ineffective assistance of counsel claims fail.

### A. Del Valle's Initial Petition Is Timely, But His Amended Petition Is Procedurally Defaulted.

#### 1. Del Valle's Initial Petition (Grounds 1–3) is Timely.

Respondent contends that Del Valle's Initial Petition is untimely. ECF No. [54] at 28. According to Respondent, Del Valle's Initial Petition is untimely because, absent any tolling, the Initial Petition was filed more than a year after Del Valle's conviction became final. *Id*. at 28–35. Although Respondent acknowledges that Del Valle's Initial Petition would be timely if the limitations period was tolled during Del Valle's post-conviction proceedings, Respondent argues that because Del Valle's Motion for Rehearing of his Post-Conviction Appeal was not timely filed, it did not have a tolling effect on the limitations period. *Id*. at 30–31.

Del Valle argues that his Initial Petition is timely because the Motion for Rehearing of his Post-Conviction Appeal was timely filed, thus tolling the one-year limitations period. ECF No. [51] at 38. Indeed, Del Valle argues that his conviction was not final until the Third District ruled on his Motion for Rehearing of his Post-Conviction Appeal. *Id*. Alternatively, Del Valle argues that his Initial Petition is timely under the doctrine of equitable tolling because the only reason his Motion for Rehearing of his Post-Conviction Appeal was filed after the deadline was because there was a "lockdown" at his prison, which prevented him from sending outgoing mail. *Id*. at 38–39.

The AEDPA imposes a one-year statute of limitations on petitions for writ of habeas corpus filed by state prisoners. *See* 28 U.S.C. § 2244(d)(1) ("A 1-year period of limitation shall apply to

an application for a writ of habeas corpus . . . .").  Specifically, the AEDPA provides that the limitations period shall run from the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* at § 2244(d)(1)(A)–(D).  Here, the parties agree that Del Valle's conviction became final on August 24, 2010.  ECF Nos. [51] at 36; [54] at 29.  Pursuant to 28 U.S.C. § 2244(d)(1)(A)—the applicable section of the AEDPA—Del Valle had until August 24, 2011 to file his Initial Petition.  Del Valle's Initial Petition was not filed until January 2, 2014.  ECF No. [1].  Therefore, absent any tolling of the applicable one-year limitations period, Del Valle's Initial Petition would be untimely.

However, under the AEDPA, the limitations period is tolled for "[t]he time during which a properly filed application for post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).  Here, the parties agree that the one-year limitations period was tolled when Del Valle filed his Post-Conviction Motion.  ECF No. [51] at 36.  However, there is a disagreement as to when Del Valle filed his Post-Conviction Motion and as to when the Third District's ruling on Del Valle's Post-Conviction Motion became final.

First, Respondent argues that Del Valle's Post-Conviction Motion was filed on June 8, 2011—the date that appears on the state appellate court's docket.  ECF No. [54] at 18 n.3.  Respondent notes that the certificate of service in Del Valle's Post-Conviction Motion is unsworn

and does not indicate what date it was handed to prison officials, or any date at all for that matter. *Id*. However, Del Valle argues that because he was in prison, the "mailbox rule" dictates that his Post-Conviction Motion was filed on the date that he placed it in the hands of prison officials, which Del Valle contends occurred on May 25, 2011. ECF No. [51] at 36–37. Del Valle argues that he has provided both a mail log from the prison and a copy of the cover page of his Post-Conviction Motion, which demonstrate that he mailed his Post-Conviction Motion on May 25, 2011. *Id*. at 37; *see* ECF No. [51-1] at 2–5. Del Valle contends that Respondent has not provided anything to indicate that either document is incorrect. ECF No. [51] at 37.

"In determining whether-or when-a state court pleading was 'properly filed' for purposes of § 2244(d)(2), [courts] look to state procedural rules." *Dean v. Sec'y for Dep't of Corr.*, 361 F. App'x 38, 42 (11th Cir. 2010) (quoting *Wade v. Battle*, 379 F.3d 1254, 1259–60 (11th Cir. 2004)). "Under Florida's inmate 'mailbox rule,' Florida courts 'will presume that a legal document submitted by an inmate is timely filed *if it contains a certificate of service showing that the pleading was placed in the hands of prison or jail officials for mailing on a particular date,* if . . . the pleading would be timely filed if it had been received and file-stamped by the Court on that particular date.'" *Id*. (emphasis in original) (quoting *Thompson v. State*, 761 So. 2d 324, 326 (Fla. 2000)). "Once the inmate meets his burden, the presumption of timely filing 'shifts the burden to the State to prove that the document was not timely placed in prison officials' hands for mailing.'" *Id*. (alterations adopted) (quoting *Thompson*, 761 So. 2d at 326) Here, although Del Valle's Post-Conviction Motion did not include a certificate of service indicating the date of the motion or when the motion was handed to prison officials, Del Valle has provided both a prison log indicating that the prison officials received his Post-Conviction Motion on May 25, 2011 and a stamped copy of his Post-Conviction Motion indicating that it was provided to Graceville Correctional Facility officials on May 25, 2011 for mailing. ECF No. [51-1] at 2–3. Although Respondent notes that it

obtained a copy of Del Valle's Post-Conviction Motion from the clerk of courts, the document in the court files is missing the stamp showing when it was handed to prison officials. Respondent acknowledges, however, that because it has been unable to obtain proof as to when the document was handed to prison officials, "it takes no position if the Court uses the earlier May 25, 2011 date." ECF No. [54] at 18 n.3. The Court, therefore, finds that, pursuant to the mailbox rule, Del Valle's Post-Conviction Motion was filed on May 25, 2011. As such, the limitations period for Del Valle's Initial Petition was tolled starting on May 25, 2011.

Second, Respondent argues that Del Valle's Motion for Rehearing was not timely filed based on the date that the Third District's ruling became final. ECF No. [54] at 30. Respondent argues that the tolling period ended on September 11, 2013—the date that the Third District issued its mandate. *Id.* Del Valle, on the other hand, argues that the operative date of the Third District's ruling on his Post-Conviction Motion is when the Third District denied his Motion for Rehearing—October 4, 2013. ECF No. [51] at 38. Although Del Valle acknowledges that he did not file his Motion for Rehearing until after that deadline had expired, he stresses that the Third District did not deny the Motion for Rehearing as untimely and ruled on the merits. ECF No. [51] at 37–41. Therefore, according to Del Valle, the date when his post-conviction case finalized was on October 4, 2013, which would mean his Initial Petition was timely filed. *Id.* at 41.

Here, after the state trial court denied Del Valle's Post-Conviction Motion, Del Valle timely appealed to the Third District. ECF No. [13-12] at 81. On July 31, 2013, the Third District affirmed the trial court's ruling on Del Valle's Post-Conviction Motion. *Del Valle*, 119 So. 3d at 451. However, following the Third District's denial of his Post-Conviction Motion, Del Valle filed a Motion for Extension of Time to File Motion for Rehearing, which the Third District granted. *See* ECF No. [13-16]. The Third District gave Del Valle until Saturday, September 7, 2013 to file his Motion for Rehearing. *Id.* On Tuesday, September 10, 2013, Del Valle filed his

Motion for Rehearing.  ECF No. [13-18] at 23.  The following day, on September 11, 2013, the Third District issued its Mandate.  ECF No. [13-17].  Then, on October 4, 2013, Del Valle's Motion for Rehearing was denied by the Third District.  ECF No. [51-1] at 5.

Given that Del Valle's Motion for Rehearing was filed merely three days after the deadline of September 9, 2013, the issue before the Court is whether Del Valle's Motion for Rehearing tolled the AEDPA time limits.  If it did, meaning that the tolling on the one-year limitations period ended on October 4, 2013, the date that the Third District denied Del Valle's Motion for Rehearing, then Respondent agrees that Del Valle's Initial Petition is timely.  ECF No. [54] at 31.  If it did not, meaning that the tolling on the one-year limitations period stopped on September 11, 2013, then Del Valle agrees that his Initial Petition is untimely.  ECF No. [51] at 38.  The Eleventh Circuit has addressed an analogous situation.

In *Van Zant v. Florida Parole Commission*, 308 F. App'x 332, 333 (11th Cir. 2009), the Eleventh Circuit analyzed whether an untimely state court motion for rehearing tolled the time limit for purposes of the AEDPA.  The Eleventh Circuit explained that "[a] rule governing filings in state court must be firmly established and regularly followed before non-compliance with the rule will render a petition not properly filed for purposes of AEDPA's tolling provision."  *Id*. at 335.  Indeed, the Eleventh Circuit noted that "Florida courts may extend the time for motions for rehearing at their discretion, rather than applying the rule."  *Id*.  Accordingly, the Eleventh Circuit held that the defendant's failure to file the motion for rehearing within the time limit did not render the defendant's motion improperly filed for purposes of the AEDPA.  *Id*.

Here, Del Valle's argument that the Third District did not deny his Motion for Rehearing as untimely or state that it was without jurisdiction to consider the Motion for Rehearing, is well taken.  ECF No. [51] at 39.  Indeed, the state appellate docket indicates that on October 4, 2013, the Third District stated that, "[u]pon consideration, [Del Valle's] motion for rehearing is hereby

denied . . . [Del Valle's] motion for rehearing en banc is denied."  ECF No. [51-1] at 5.  Therefore, based on the Third District's consideration of Del Valle's Motion for Rehearing, and pursuant to *Van Zant*, Del Valle's failure to file his Motion for Rehearing within the time limit imposed by the Third District did not render his motion improperly filed for purposes of the AEDPA. Accordingly, Del Valle's post-conviction case was finalized on October 4, 2013, and the limitations period was tolled until that date.[11]

To summarize, Del Valle's Initial Petition is timely under the AEDPA.  Del Valle's conviction became final on August 24, 2010.  However, Del Valle's state post-conviction proceedings tolled the applicable one-year limitations period from May 25, 2011, until October 4, 2013.  Therefore, the total *untolled* time from the date that Del Valle's conviction became final on August 24, 2010, until he filed his Initial Petition on January 2, 2014, is exactly 365 days. Accordingly, Del Valle's Initial Petition (Grounds 1–3) is timely.[12]

---

[11] "In Florida, a state court of appeals' order denying a rehearing on its affirmance of the state trial court's denial of a motion for post-conviction relief is pending until the mandate issues." *Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000).  However, this case presents an unusual circumstance because the Third District's mandate was issued *before* the Third District ruled on Del Valle's Motion for Rehearing.  In *Robbins v. State*, 992 So. 2d 878, 879 (Fla. 5th DCA 2008), the Fifth District Court of Appeal discussed a similar situation when a mandate was prematurely issued.  According to the Fifth District, when a mandate has been issued before a motion for rehearing is received, the mandate will be withdrawn, and the motion granted if the motion is meritorious.  *Id*.  But, if the motion has no merit, typically the court dismisses it without engaging in a cumbersome mandate withdrawal/reissuance procedure.  *Id*.  Therefore, pursuant to *Robbins*, Del Valle's post-conviction case was finalized when the Third District ruled on his Motion for Rehearing, not the date of the prematurely issued mandate.

[12] Given the undersigned's finding that Del Valle's Initial Petition was timely filed, the undersigned does not address Del Valle's alternative argument that the doctrine of equitable tolling applies here because the only reason he was not able to timely file his Motion for Rehearing on September 7, 2013, was because he was prevented from doing so by a prison lockdown that lasted from September 6, 2013, until September 10, 2013.  ECF No. [51] at 41.  Although Respondent contends that the Graceville Corrections Institution was not on lockdown from September 6, 2013, until September 8, 2013, Respondent states that on September 9, 2013, there was a "mass search and an inmate death that would have resulted in very restricted movement on the compound on September 9th and 10th, 2013."  ECF No. [54] at 33.  Indeed, Respondent submits that "a hearing

### 2. Del Valle's Amended Petition (Grounds 4–5) Is Procedurally Defaulted.

Although the undersigned finds that Del Valle's Initial Petition (Grounds 1–3) is timely, Del Valle's Amended Petition (Grounds 4–5) is not.  Del Valle concedes that his Amended Petition was filed after more than one year of non-tolled time for AEDPA purposes had lapsed.  ECF No. [51] at 44.  Del Valle also concedes that none of the grounds raised in the Amended Petition (Grounds 4–5) were raised in prior state post-conviction proceedings, or at any time before they were filed in federal court.  *Id*.  Indeed, Del Valle concedes that Grounds 4–5, which have to do with Del Valle's trial and sentence, do not relate back to the grounds in his Initial Petition, which have to do with the Motion to Suppress.  *Id*.  In sum, Del Valle concedes that the Amended Petition was not timely filed, and the grounds raised in the Amended Petition were not exhausted below pursuant to federal habeas corpus law.  *Id*.

Nevertheless, Del Valle urges the Court to address the merits of his Amended Petition pursuant to the exception to the typical exhaustion and timeliness requirements established in *Martinez v. Ryan*, 566 U.S. 1, 4 (2012).  *Id*. at 44–48.  According to Del Valle, the *Martinez v. Ryan* exception applies to him because the record makes clear that (1) he was not appointed an attorney to assist him in developing his state habeas corpus claims despite his request, and (2) he was specifically denied the opportunity to amend his state habeas motion before it was heard.  ECF No. [51] at 44.

---

is not necessary on this point" and "[i]n the interest of judicial economy, considering that this matter has already experienced significant delays," Respondent addressed the merits of Del Valle's Petition.  Accordingly, in light of the undersigned's finding that Del Valle's Initial Petition was timely filed, Respondent's acknowledgement that Del Valle's movements were restricted around the time his Motion for Rehearing was due, and in the interest of juridical economy, addressing Del Valle's alternative argument is unnecessary.

Pursuant to the doctrine of procedural default, a federal court will not review the merits of a claim, including constitutional claims, that a state court declined to hear because the state prisoner failed to abide by a state procedural rule.  *See Martinez*, 566 U.S. at 9 (citing *Coleman v. Thompson*, 501 U.S. 722, 747–48 (1991)).  "A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law."  *Id*. at 10 (citing *Coleman*, 501 U.S. at 750).  In *Martinez*, the Supreme Court addressed the question of whether ineffective assistance of counsel in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide "cause" for a procedural default in a federal habeas proceeding.  *Id*. at 9.  The Supreme Court answered the question in the affirmative, and qualified its decision in *Coleman*, which held that negligence on the part of a prisoner's postconviction attorney did not qualify as cause, with a narrow exception—inadequate assistance of counsel, or lack of appointment of counsel, at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.  *Id*.

Specifically, the Supreme Court held that:

> when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Id*. at 14.  The Supreme Court explained that "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  *Id.*

Here, Del Valle's argument pursuant to *Martinez v. Ryan* fails.  Even if the undersigned agrees that Del Valle was not appointed counsel at the state initial post-conviction proceeding and

he was unrepresented, Del Valle fails to demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one. Specifically, Del Valle fails to demonstrate that any of the ineffective assistance of trial counsel claims in his Amend Petition (Grounds 4–5) are substantial.

First, Del Valle's claim that defense trial counsel was ineffective in failing to utilize a defense of independent act and request an independent act instruction (Ground 4) lacks merit. ECF No. [51] at 64. Del Valle argues that, given the facts in the case, the defense of independent act was the only defense available, but it was not utilized. *Id*. at 65. Specifically, Del Valle argues that his statements supported the theory that one of his co-defendants shot and killed Gonzalez as an independent act that was not part of the common plan, which was to surprise Gonzalez, a known drug dealer, and rob him of money and drugs. *Id*. at 66. In other words, the shooting was not part of the plan. *Id*. According to Del Valle, there was a viable argument that the shooting was not part of the criminal scheme because it did not occur in furtherance of the robbery and was an independent act by another conspirator. *Id*.

Under Florida law, the independent act doctrine applies "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, 'which fall outside of, and are foreign to, the common design of the original collaboration.'" *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000) (quoting *Dell v. State*, 661 So. 2d 1305, 1306 (Fla. 3d DCA 1995)). Under these limited circumstances, "a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act." *Id.* (quoting *Dell*, 661 So. 2d at 1306). The Florida standard jury instruction for independent act reads, in pertinent part, as follows:

> If you find that the crime alleged was committed, an issue in this case is whether the crime of (crime alleged) was an independent act of a person other than the defendant. An independent act occurs when a person other than the defendant commits or attempts to commit a crime

Elements

1. which the defendant did not intend to occur, and

2. in which the defendant did not participate, and

3. which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.

If you find the defendant was not present when the crime of (crime alleged) occurred, that does not, in and of itself, establish that the (crime alleged) was an independent act of another.

If you find that the (crime alleged) was an independent act of [another] [ (name of individual) ], then you should find (defendant) not guilty of the crime of (crime alleged).

*In re Standard Jury Instructions in Criminal Cases (97–1)*, 697 So. 2d 84, 96 (Fla. 1997).

Del Valle's ineffective assistance of counsel claim lacks merit because the evidence presented at trial shows that he was not entitled to the independent act jury instruction. Del Valle acknowledges that the defense strategy at trial was to "explicitly concede that Mr. Del Valle was there and participated in the robbery (something that defense counsel did in opening) but did not know about or commit the murder." ECF No. [51] at 68–69. Thus, Del Valle's claim rests on defense trial counsel's failure to request an independent act jury instruction. Here, however, the evidence presented at trial did not support the theory of an independent act—that the shooting of Gonzalez by one of Del Valle's co-defendants was not a "reasonably foreseeable consequence" of the plan to rob Gonzalez. Specifically, as Respondent contends, none of the evidence at trial supported the notion that Del Valle thought he was headed to a drug deal and that the robbery was a surprise. Indeed, all the testimony adduced at trial was that Del Valle planned the "drug rip" and directed his co-defendants to bring guns. The testimony was also that Del Valle shot Gonzalez, who was the driver of the vehicle, while his co-defendants went to the passenger side of the vehicle. Although the jury ultimately found that Del Valle did not discharge a firearm, the evidence

adduced at trial did not support the contention that the shooting of Gonzalez was not a foreseeable consequence of this armed robbery.  *See Jones v. State*, 804 So. 2d 551, 552 (Fla. 3d DCA 2002) ("A killing in the face of either verbal or physical resistance by a victim is properly viewed as being within the original criminal design.").

Del Valle relies on *McCree v. Secretary, Department of Corrections*, 663 F. Supp. 2d 1316 (M.D. Fla. 2009) in support of his claim.  ECF No. [51] at 68.  Although *McCree* involves a similar claim—the failure of defense trial counsel to argue an independent act defense and request an independent act jury instruction—that case is distinguishable.  In *McCree*, the court found that there was a "substantial amount of evidence" presented that, if believed, would support the theory that petitioner believed he was assisting in the commission of a non-violent drug deal, that he did not know about the attempted robbery in advance or take part in it, or that the attempt to rob the victim was outside and not a reasonable foreseeable consequence of the drug deal he thought had been planned.  663 F. Supp. 2d at 1327–28.  However, the same cannot be said here, where the evidence at trial showed that Del Valle planned and participated in the robbery that resulted in the death of Gonzalez.  Therefore, Del Valle's claim that defense trial counsel was ineffective in arguing and requesting an independent act instruction lacks merit.

Second, Del Valle's claim that he is actually innocent and that his life sentence is a manifest injustice (Ground 5), also lacks merit.  Here, Del Valle's counsel stated that he "does not see a good faith argument that this equates to 'actual innocence' of the underlying crimes or that the sentence is Constitutionally disproportionate under the relevant law . . . ." ECF No. [51] at 70. Given this concession by Del Valle's attorney that there is no good faith argument to support Del Valle's claim, the undersigned finds that Del Valle's claim that he is actually innocent and that his life sentence is a manifest injustice lacks merit as well. Also, because this argument is not based on an ineffective assistance of counsel claim, it does not fall under *Martinez v. Ryan*.

Accordingly, for the reasons previously noted, *Martinez v. Ryan* fails to resuscitate Del Valle's procedurally defaulted Amended Petition.[13]   Thus, the undersigned only considers the claims asserted in Del Valle's Initial Petition (Grounds 1–3).

### B.   The State Court's Denial Of Del Valle's Motion To Suppress Was Contrary To Clearly Established Supreme Court Precedent.

Del Valle argues that the state courts unreasonably applied the facts to the law in denying his Motion to Suppress and affirming that denial on appeal.   ECF No. [51] at 49.   Specifically, Del Valle argues that he unambiguously invoked his *Miranda* rights three times and unequivocally told the detective interviewing him that he did not want to talk any further.   *Id*.   Del Valle argues that the detective questioning Del Valle did not scrupulously honor Del Valle's right to terminate questioning.   *Id*. at 52.   Instead, according to Del Valle, his incriminating statements were made only after the detective initiated further conversation with him.   *Id*. at 53–54.   Respondent counters that the state court's application of the facts to the law was not contrary to or an unreasonable application of clearly established federal law.   ECF No. [54] at 49.   Specifically, Respondent argues that the state courts were not required to believe Del Valle's theory of the facts, and both the trial and appellate courts properly considered the totality of the circumstances.   *Id*. at 52.   Respondent argues that there is no support in the record for the conclusion that any of the detective's conduct was protracted, evocative, or in any other way coercive.   *Id*. at 58.   Therefore, Respondent argues that Del Valle's statements were properly admitted into evidence at trial.   *Id*. at 60.

---

[13] In *Lambrix v. Singletary*, 520 U.S. 518 (1997), the Supreme Court explained that where the merits of the claim may be reached and readily disposed of, judicial economy dictates reaching the merits of the claim while acknowledging the procedural default and bar in the alternative. However, given the undersigned's finding with respect to the suppression of Del Valle's confession, it is not necessary to specifically address the merits of Del Valle's procedurally defaulted Amended Petition, particularly because, as previously noted, those claims are not substantial.

The undersigned reviews the state courts' decisions with respect to Del Valle's Motion to Suppress pursuant to the stricture of § 2254(d), which provides that a federal court may grant habeas relief if the state court's decision was "contrary to, or an unreasonable application of, clearly established federal law" or an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Lumpkins*, 449 F. App'x. at 883 (citing 28 U.S.C. § 2254(d)). Indeed, federal courts may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (internal quotations omitted) (quoting *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)). Thus, the issue before the Court is whether the denial of Del Valle's Motion to Suppress was based on an unreasonable application of clearly established federal law or on an unreasonable determination of the facts based on the evidence presented to the state court. The Court finds that the denial of Del Valle's Motion to Suppress was based on an unreasonable application of clearly established federal law.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect that right, the Supreme Court held in *Miranda v. Arizona* that an interrogation must cease when a person in custody indicates that he wishes to remain silent. 384 U.S. 436, 473–74 (1966). Specifically, the Supreme Court in *Miranda* stated:

> "[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

*Id.* Here, of course, it is undisputed that Del Valle invoked his right to remain silent. Indeed, the Parties agree that the issue at hand is whether the resumption of questioning after he invoked, which is when the incriminating statements were made, passes Fifth Amendment muster.

The Supreme Court in *Miranda* explained that "the interrogation must cease" when the person in custody indicates that "he wishes to remain silent." *Id.* at 474. In *Michigan v. Mosley*, the Supreme Court clarified "under what circumstances, if any, a resumption of questioning" after a defendant has invoked his right to remain silent "is permissible." 423 U.S. 96, 101 (1975). After analyzing possible interpretations of the rule regarding the right to remain silent as announced in *Miranda*, the Supreme Court noted that "[t]he critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.'" *Id.* at 103 (quoting *Miranda*, 384 U.S. at 474)). Indeed, the Supreme Court in *Mosley* observed that "[t]hrough the exercise of his option to terminate questioning [a defendant] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.* at 104. The Supreme Court, therefore, concluded that the "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.*

In *Mosley*, the police "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106. Given those facts, the Supreme Court in *Mosley* held that the right to cut off questioning was fully respected in that case, and that the admission of the defendant's incriminating statement did not violate *Miranda*. *Id.* at 107.

The Eleventh Circuit, however, has observed that the "scrupulously honored" standard articulated in *Mosley* did not provide "clear guidance on the specific circumstances under which questioning may be resumed." *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1296 (11th Cir. 2007). Instead, the Eleventh Circuit has noted that "[w]hat little guidance *Mosley* can provide on how to utilize 'scrupulously honored' can be divined by looking to the factors the Court considered in determining that the post-invocation resumption of questioning was proper." *Id.* The Eleventh Circuit thereafter summarized the relevant factors identified by the Supreme Court in *Mosley* as follows: (1) "the initial interrogation ended immediately once [the defendant] invoked his right to remain silent"; (2) "prior to the re-initiation of questioning, a substantial amount of time elapsed"; (3) "prior to the re-initiation of interrogation, [the defendant] was again read his rights"; and (4) "once the interrogation resumed, [the defendant] was questioned by a different officer about an unrelated crime." *Id.* at 1297 (citing *Mosley*, 423 U.S. at 104–07). No single *Mosley* factor is dispositive. *United States v. Gray*, 771 F. App'x 976, 979 (11th Cir. 2019). Instead, the Court looks to the circumstances as a whole. *Id.*; *see Jacobs v. Singletary*, 952 F.2d 1282, 1293–96 (11th Cir. 1992) (considering whether the detective immediately ceased the questioning upon the suspect's invocation, the passage of time between the suspect's invocation and the resumption of questioning, the statements made by the detective after the suspect's invocation, whether it was the suspect who re-initiated the conversation with the detective, and whether the suspect waived the right to remain silent); *United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990) (considering the fact that when the suspect invoked the right to remain silent, the officers "ceased questioning him and left him alone inside a police vehicle . . . questioning of [the suspect] did not take place until over an hour later and . . . at the [suspect]'s request . . . [and after the suspect] initiated the encounter and knowingly waived his rights by signing the waiver form"); *Jackson v. Dugger*, 837 F.2d 1469, 1472 (11th Cir. 1988) (considering the fact that "police immediately cut off any

questioning . . . a significant period of time (over six hours) elapsed between [the suspect]'s original invocation of his right to remain silent and the time of his confession . . . the conduct of police was such as to overbear the [suspect]'s . . . [and] [t]he record reflects nothing more than diligence on behalf of the police to assure that [the suspect] was fully informed of his rights as he was being processed upon arrest"). In sum, if the accused invokes his right to remain silent, questioning must immediately cease and "subsequent questioning can be directed only toward clarifying the initial request." *United States v. Muhammad*, 196 Fed. App'x 882, 885 (11th Cir. 2006) (citation omitted). Thus, "at a minimum, the scrupulously honored standard requires that the government refrain from questioning a suspect unless he both (1) initiates further conversation; and (2) waives the previously asserted right to silence. *Id.* (citation omitted).

In this case, the state trial court's ruling on Del Valle's Motion to Suppress, in its entirety, was the following:

> Okay. I am not happy with Detective Arango not [ceasing] to question the defendant after I think he had agreed the defendant to talk about the photos and was not talking about the facts. I believe he gave good Miranda warning. The defendant was put on notice. The defendant understood them and invoked them. And he [chose] to and nobody forced him. He was there. He could have left.
>
> Although he's just 18, he's a big boy. The girlfriend was there. He didn't say I spoke to your girlfriend and told me everything. There was nothing asked of the defendant or offered.
>
> I think it was free and voluntarily. The defendant was credible. I don't have reason to believe it's not true the defendant initiated the second statement and that he was warned of his Miranda warnings at the beginning. So I'm going to allow the statement to come in.
>
> Okay, so the motion is denied.

ECF No. [13-3] at 86:14–87:7. With respect to Del Valle's statement, the Third District held:

> The defendant argues that the defendant's invocation of the right to terminate questioning was not "scrupulously honored" within the meaning of *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). We disagree. As the Florida Supreme Court said in a similar case, "upon consideration of the totality of

the circumstances, we believe that the police did not violate the principles of *Miranda* or *Mosley* in obtaining appellant's confession." Henry v. State, 574 So.2d 66, 69 (Fla. 1991).

The defendant relies on *State v. Brown*, 592 So. 2d 308 (Fla. 3d DCA 1991), but that case is not on point. There the defendant invoked his right to silence and requested counsel. The officer continued to discuss the case and outlined the State's evidence against the defendant. The officer then left the defendant handcuffed in an interrogation room for an hour and a half, after which he was taken to a booking room. The defendant then stated that he wanted to tell the truth, waived his previously-invoked rights to silence and counsel, and gave a statement. The majority opinion in Brown held that the officer's monologue about the State's case against the defendant amounted to "interrogation" for *Miranda* purposes. *Brown*, 592 So. 2d at 308–09.

In the present case, the detective engaged in no such conduct. After questioning ceased, the defendant remained in the detective's office, and was not handcuffed, while the detective spoke with the girlfriend in an adjacent office. The trial court believed the detective's testimony that, upon returning to tell the defendant that the questioning of the girlfriend was completed, the defendant initiated the conversation with the detective and stated that he wanted to tell the detective what had happened.

Affirmed.

*Del Valle*, 17 So. 3d at 847.

As an initial matter, the state courts failed to: (1) analyze at all whether the detective's statement to Del Valle, that he had concluded the interview with Del Valle's girlfriend, was proper in light of Del Valle's clear and undisputed invocation of *Miranda*; and (2) discuss any of the *Mosley* factors. Based on the facts before the state trial and appellate courts, it is undisputed that Del Valle invoked his right to remain silent three times. *Del Valle*, 17 So. 3d at 846–47.[14] Indeed,

---

[14] After Del Valle first invoked his right to remain silent, Detective Arango did not immediately cease questioning Del Valle. Instead, Detective Arango sought to clarify whether Del Valle did not want to talk about the crime or whether he did not want to continue identifying suspected members of the Hillside Gangsters in the photographs Detective Arango presented to Del Valle, as they had previously agreed off the record. The detective's questions clarifying Del Valle's first invocation do not run afoul of *Miranda* given that it is well-settled that "an attempt at clarification does not run afoul of the *Miranda* right to remain silent, and it does not affect [the court's] conclusion that [the defendant's] rights were scrupulously honored by the government." *Muhammad*, 196 F. App'x at 886.

after Del Valle reiterated that the did not want to speak anymore, Detective Arango terminated the recorded statement.  Detective Arango told Del Valle that he was going to speak with Del Valle's girlfriend, who was waiting in another detective's office.  Notably, Del Valle had just identified his girlfriend, Lazara Parets, in one of the photographs that Detective Arango showed Del Valle regarding possible members of the Hillside Gangsters.  Detective Arango spoke with Del Valle's girlfriend for approximately an hour and ten minutes, from 4:10 a.m until 5:20 a.m.

Once Detective Arango was done speaking with Del Valle's girlfriend, he returned to where Del Valle was located and told Del Valle that he was finished speaking with his girlfriend. This is the statement that bears examination.  Specifically, although Detective Arango stopped interrogating Del Valle after he invoked his right to silence for the third time, the Court must focus on whether Detective Arango scrupulously honored Del Valle's right to remain silent by returning to tell Del Valle that he had finished speaking with his girlfriend—the suspected member of the Hillside Gangsters that Del Valle had recently identified—shortly after Del Valle had invoked his right to remain silent.

"*Miranda* and its progeny require the police to terminate the interrogation if the suspect 'indicates, in any manner, at any time . . . during questioning that he wishes to remain silent.'" *Christopher v. State of Fla.*, 824 F.2d 836, 841 (11th Cir. 1987) (quoting *Mosley*, 423 U.S. at 100–01).  Officers violate *Miranda* when they fail to cease interrogation.  *Id.*  Although officers are permitted to seek clarification of whether a suspect intends to invoke the right to remain silent, they are not permitted to ask questions "clothed in the guise of 'clarification,' [] designed to . . . delay, confuse, or burden the suspect in his assertion of his rights.  Because such questions serve to keep the suspect talking, not to uphold his right to remain silent, they constitute unlawful 'interrogation,' not permissible clarification."  *Id.* at 842 (citing *Mosley*, 423 U.S. at 924).  To be

clear, once a suspect invokes his right to remain silent, interrogation must cease for a "significant period." *Id.* at 844.[15]

The case at hand is similar to *Christopher v. State of Florida*, where the Eleventh Circuit concluded that the petitioner was entitled to habeas relief because his right to cut off questioning was not scrupulously honored under *Miranda* and *Mosley*. *Id.* at 845–46.   In that case, the petitioner was interrogated regarding a murder. *Id.* at 838.   After two hours of questioning, the petitioner unequivocally invoked his right to remain silent, but the interrogation did not immediately cease. *Id.* at 840.  Specifically, after the petitioner invoked his right to remain silent, the officers questioned why the petitioner had invoked and why he was upset. *Id.*   The Court concluded that the officers' statements following the petitioner's invocation violated *Miranda* because they were not an attempt at seeking clarification, but instead, were a challenge to the petitioner's decision to remain silent. *Id.* at 842.   Moreover, the Court noted that the officers' subsequent statements regarding whether the petitioner would agree to be extradited on the murder charges were considered interrogation because they were not statements regarding routine matters but were instead statements aimed at "open[ing] up a more generalized discussion relating directly or indirectly to the investigation." *Id.* at 845 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983)).   Thus, the Court concluded that because the interrogation never ceased, any questions posed by the petitioner after he had invoked his right to remain silent could not be construed as

_____

[15] A "significant period" can be as short as one to two hours if the police "carefully observed other procedural safeguards," such as leaving the suspect alone and only resuming questioning upon the suspect's request. *See Jacobs*, 952 F.2d at 1294–96; *Nash*, 910 F.2d at 752–53 (holding post-invocation statements admissible where an hour had passed, the suspect had been re-read his rights, and evidence of who re-initiated discussions was disputed); *Jackson v. Dugger*, 837 F.2d 1469, 1472 (11th Cir. 1988) (holding a six-hour period of non-interrogation sufficient and noting that repeated reading of the *Miranda* warnings was not coercive).

initiation by a suspect. *Id.* at 845–46. Accordingly, the Eleventh Circuit determined that the petitioner's statements were inadmissible. *Id.* at 846.

The issue here is whether Detective Arango's decision to return to Del Valle to state that he had finished questioning his girlfriend was a statement aimed at opening up a generalized discussion relating to the investigation. Given that the girlfriend was also identified by Del Valle along with other gang members and had been taken to the station with him and questioned for an hour, the statement was clearly aimed at opening up a discussion with Del Valle regarding the investigation. The detective did not ask a neutral question or make a neutral comment. He did not ask Del Valle if he wanted water or needed to use the restroom. Indeed, the only response that Del Valle could have had to that statement would be concerning the matter that was being investigated. *See Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) ("[T]he term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (quotation marks omitted).

Although Detective Arango testified that he "did not initiate that part of [the] conversation, [Del Valle] did," it is undisputed that it was Detective Arango who returned to speak with Del Valle. ECF No. [13-3] at 62:2–3. Detective Arango's testimony that it was Del Valle who initiated the conversation simply ignores whether the statement about Del Valle's girlfriend was an improper attempt to re-initiate the questioning. Indeed, this is not a situation where Del Valle left the office where he was waiting and looked for Detective Arango to tell him that he wanted to discuss the investigation. *See Muhammad*, 196 Fed. App'x at 886 ("Muhammad's statements after the termination of the interrogation evinced a willingness and a desire for a generalized discussion about the investigation. Consequently, we conclude that Muhammad re-instigated the dialogue with the government after his request to cut off questioning had been scrupulously honored.")

(internal citations and quotations omitted).  On the contrary, Del Valle told Detective Arango that he wanted to tell him what had happened *after* Detective Arango returned to the the room and told Del Valle that he finished questioning his girlfriend.  Detective Arango did not come back, for example, to tell Del Valle that they were done and that he could leave.

Given Detective Arango's decision to resume the interrogation of Del Valle shortly after he had invoked his constitutional right to remain silent, Del Valle's right to cut off questioning and terminate the interrogation was not scrupulously honored.  Unlike in *Mosley*, where the police immediately ceased the interrogation after the defendant invoked his right to remain silent, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation, no such safeguards were present in this case.

First, as previously noted, Detective Arango did not cease the interrogation after Del Valle invoked his right to remain silent.  Although the first comment was meant to clarify and is permissible, Detective Arango continued the interrogation after Del Valle invoked twice more.  Indeed, the evidence in the record is that after the recording ceased, Detective Arango continued to speak with Del Valle regarding his invocation.

Second, when Detective Arango resumed the interrogation of Del Valle by returning to tell Del Valle he had finished questioning his girlfriend, only an hour and ten minutes had lapsed.  Not only was the time period short, Del Valle remained in the same place and was waiting as another suspect was being questioned.  In short, Del Valle was waiting while the investigation continued.

Third, Detective Arango did not provide a fresh set of *Miranda* warnings after his last encounter with Del Valle.

Finally, the second interrogation by Detective Arango was not about a separate crime; it was the same investigation.

Respondent's argument that "there is absolutely no support in the record for the conclusion that any conduct of the detective was 'protracted and evocative' or in any other way coercive," is unpersuasive. ECF No. [54] at 58. Detective Arango's decision to return to Del Valle to tell him that he finished questioning his girlfriend was evocative. *Jones v. State*, 497 So.2d 1268 (Fla. 3d DCA 1986) (interrogation under *Miranda* refers not only to express questions but also includes police conduct likely to induce incriminating responses); *Glover*, 677 So. 2d at 376 (finding that the conduct of the police officers rose to the level of interrogation or its functional equivalent because the police officer's conduct toward the defendant was protracted and evocative such that the atmosphere was tantamount to a custodial interrogation). The Court is hard pressed to imagine what purpose coming into the room to tell Del Valle that he was done questioning another suspect could have had other than to evoke some response from Del Valle.

The circumstances leading to Del Valle's confession closely resemble the circumstances in *Christopher* where the Eleventh Circuit determined that the officers' response to the suspect's invocation of his right to remain silent "constituted an unlawful continuation of the interrogation." 824 F.2d at 842. Indeed, after Del Valle unequivocally invoked his right to remain silent three times, Detective Arango left the room to speak with Del Valle's girlfriend. Detective Arango returned to the room approximately one hour later, not upon Del Valle's request, but to inform Del Valle that he had just finished speaking with his girlfriend. Detective Arango's evocative statement is at odds with *Miranda* because it was intended to "open up a more generalized discussion relating directly or indirectly to the investigation," and as such constitutes interrogation. *Id.* at 845 (quoting *United States v. Johnson*, 812 F.2d 1329, 1331 (11th Cir. 1986)). Because Detective Arango's statement regarding his conversation with Del Valle's girlfriend was directly related to the investigation in question, his statement constituted an unlawful continuation of the interrogation notwithstanding Del Valle's unequivocal invocation of his right to remain silent.

Accordingly, Del Valle's right to remain silent was not "scrupulously honored" by Detective Arango.

Although § 2254(d) poses a high bar for habeas relief, the state courts' rulings on Del Valle's Motion to Suppress were contrary to Del Valle's constitutional right to remain silent and cut off questioning as established in *Miranda* and clarified in *Mosley*. Here, it is clear that Del Valle invoked his right to remain silent three times. It is equally clear that Del Valle's confession was obtained *after* Detective Arango approached Del Valle to tell him he had finished questioning his girlfriend. Detective Arango's decision to return and prompt Del Valle by telling him about the questioning of his girlfriend, whom Del Valle had previously identified as a member of the gang that was suspected to have been involved in the crime, was the equivalent of questioning and a resumption of Del Valle's interrogation. Thus, Del Valle's constitutional right to remain silent was violated when Detective Arango persisted in interrogating him after he had invoked his right to remain silent three times.

Although the state appellate court cited *Mosley* in noting that the right to terminate questioning must be scrupulously honored, it failed to discuss any of the *Mosley* factors. Indeed, the state appellate court did not consider that only one hour elapsed prior to re-initiation, that Del Valle was not again advised of his *Miranda* rights prior to that re-initiation, or that Del Valle was questioned by the same officer after he explicitly noted that he had just finished speaking with Del Valle's girlfriend. In failing to apply the *Mosley* factors to the facts of this case, the state trial and appellate courts unreasonably applied federal law to the facts of this case.

In *Gore v. Secretary for Department of Corrections*, the Eleventh Circuit held that although the Florida Supreme Court "disposed" of the accused's argument that his right to remain silent was not scrupulously honored in a footnote, it nevertheless addressed the necessary factors. 492 F.3d at 1297. The Court determined that the treatment of the issue was "within the bounds of

reasonableness" for habeas purposes because the state court sufficiently identified *Mosley* as the controlling precedent and determined that the *Mosley* factors were satisfied based on "virtually uncontested testimony," including that: "(1) the FBI discontinued the initial interrogation when [the accused] invoked his right to remain silent, (2) there was a lag of seven days between interrogations, and (3) before [the officer] began questioning [the accused] in Miami, [the accused] was re-advised of his rights under *Miranda*." *Id.* at 1298. Thus, the Court concluded that the state court's decision was not objectively unreasonable because the state court "relied on the three of the four *Mosley* factors." *Id.* at 1299.

Here, unlike *Gore*, the state courts did not discuss any of the *Mosley* factors in their analysis of whether Del Valle's decision to invoke his right to remain silent was scrupulously honored. Indeed, although the state appellate court identified *Mosley* as the controlling precedent, it did not discuss that Del Valle's interrogation did not immediately cease, the amount of time between the end of Del Valle's questioning and the re-initiation, the fact that Del Valle was not again read his *Miranda* rights prior to the re-initiation of questioning, or the fact that he was questioned by the same officer. The state courts failed to analyze whether the detective's statement to Del Valle was proper, instead simply concluding that Del Valle's statement was voluntary. This failure is critical because after clearly invoking his *Miranda* rights, whether the detective's conduct was permissible re-initiation is the critical inquiry. As such, the state courts' failure to discuss the *Mosley* factors constitutes an unreasonable application of federal law to the facts of this case. As set forth herein, because Del Valle's right to remain silent was not scrupulously honored, his statement made after Detective Arango returned from speaking with his girlfriend should have been suppressed.

### C. Del Valle's Defense Trial Counsel Was Not Ineffective.

The Sixth Amendment affords a criminal defendant the right to the assistance of counsel for his defense. U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness

must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.  To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate both (1) that his counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense.  *Id.* at 687.

First, the deficiency prong is met if no competent counsel would have taken the action that trial counsel took during the proceedings.  *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler*, 218 F.3d 1305, 1315 (11th Cir. 2000).  Review of counsel's actions is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  Additionally, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*  In other words, the petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Second, the deficiency prong is met if no competent counsel would have taken the action that trial counsel took during the proceedings.  *Gordon*, 518 F.3d at 1301 (citations omitted); *Chandler*, 218 F.3d at 1315.  The prejudice prong is met if, but for counsel's deficient performance, the outcome of the proceeding would have been favorable.  *Strickland*, 466 U.S. at 694. And yet, the error must also be "so serious" that the error "deprive[d] the defendant of a fair trial, a trial whose result is reliable[,]" in order to satisfy the prejudice prong.  *Id.* at 687.  Failure to establish either prong of *Strickland* is fatal and makes it unnecessary to consider the other.  *Id.* at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  Thus, "[e]stablishing that a state court's

application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." *Id.* (internal citations omitted). "Accordingly, where, as here, '§ 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether *there is any reasonable argument that counsel satisfied Strickland's deferential standard.*'" *Jenkins v. Comm'r, Alabama Dep't of Corr.*, 963 F.3d 1248, 1265 (11th Cir. 2020) (emphasis supplied) (quoting *Harrington*, 562 U.S. at 105).

### 1. Del Valle's Defense Trial Counsel Was Not Ineffective In Deciding Not To Call Del Valle At The Motion To Suppress Hearing.

Del Valle argues that defense trial counsel was ineffective in failing to call him to testify at the Motion to Suppress hearing. ECF No. [51] at 56. According to Del Valle, he had a very different version of what happened at the police station than the detective who testified at the Motion to Suppress hearing,[16] and despite telling his attorney everything that had happened at the

---

[16] Del Valle notes that he would have testified as follows:

> that he was locked in a holding cell whenever he was not being interrogated, that he was not free to leave because he was locked in and because his personal belongings had been taken from him when he entered the police station, that he never reinitiated contact with the detective after invoking his rights, that the detective told him that 'they kill people here in Florida for that [first degree murder],' that he never said he was thinking about giving a statement after he invoked, and that prior to ultimately giving the statement (after invoking) he was told by the detective that others were implicating him and that (after invoking the detective played a snippet of a recording of one of the co-defendant's implicating him and said 'you see, they're telling on you, let us know what happened or you and your girlfriend are going to get locked up. You know this is a first degree murder charge, they kill people for that around here. Tell me what happened and I'll make sure they don't pursue the death penalty and I'll let your girlfriend go, otherwise she can go down with you,' and that when he told the detective his girlfriend Ms. Parets had nothing to do with this the detective told him that 'you had better start talking then.'

ECF No. [51] at 56.

interrogation, his attorney did not call him to testify at the hearing.  *Id*. at 57.  Del Valle argues that without his testimony at the Motion to Suppress hearing, there was nothing to contradict the detective's testimony regarding the unrecorded portions of his interactions with Del Valle.  *Id*. at 61.  Also, Del Valle argues that the calculus of calling him to testify at the Motion to Suppress hearing was different than calling him to testify at trial because if the judge did not believe him, it would not have affected the trier of fact, as the judge was not the trier of fact and sentencing was mandatory in his case.  *Id*. at 60–61.

Respondent argues that Del Valle's argument rests entirely on defense trial counsel's evaluation of the credibility contest between Del Valle and Detective Arango's testimony.  ECF No. [54] at 65.  According to Respondent, defense trial counsel made a "strategic decision based on his client's credibility and the likelihood that the trial court would believe him."  *Id*. at 65. Respondent argues that under the circumstances, Del Valle has failed to show deficient performance by counsel.  *Id*. at 74.  Respondent claims that Del Valle has failed to demonstrate that the state court's adjudication of his ineffective assistance claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Id*. at 75.

Here, on September 19, 2011, the state trial court held a hearing on Del Valle's Post-Conviction Motion, and specifically on Del Valle's claim that defense trial counsel failed to call him at the Motion to Suppress hearing.  ECF No. [13] at 73.  Defense trial counsel testified at the hearing.  *Id.*  According to the state trial court, defense trial counsel testified that he had been a lawyer for the past thirty years and his primary practice was criminal defense.  *Id*. at 73–74. Defense trial counsel also testified that he had discussed with Del Valle the different trial strategies that they could take regarding the Motion to Suppress.  *Id*. at 74.  Defense trial counsel stated that

Del Valle had advised him that during his interrogation, he had been in different rooms and that masked officers had been present in some of them. *Id.* According to the state trial court, after discussion with Del Valle, it was defense trial counsel's decision not to make those his main allegations. *Id.* Indeed, defense trial counsel's legal analysis was that it would be a credibility match between Del Valle and the officer and that would not be the most viable argument to make. *Id.* Therefore, based on his discussions with Del Valle and his experience as a trial lawyer, defense trial counsel argued that Del Valle's confession should be suppressed because Del Valle had invoked his rights three times during the interrogation, thus any statements given should have been suppressed. *Id.*

The state trial court concluded that Del Valle failed to show that defense trial counsel was ineffective because defense trial counsel made a "strategic decision based on witness credibility and made the arguments he felt he could make given the circumstances." *Id.* at 75. Specifically, the state trial court noted that the evidence that Del Valle claims he would have testified to was before the court through Del Valle's statements and the cross-examination testimony of Detectives Arango and Spitler. *Id.* The state trial court noted that Del Valle at no time expressed that he wanted to testify at the suppression hearing, and when the court questioned Del Valle about his wishes to testify during the trial, Del Valle chose not to testify. *Id.* Finally, the state trial court rejected Del Valle's argument that his testimony would have made a difference at the suppression hearing because the court was aware of the length of the interrogation, Del Valle's age, and that Del Valle had been observed the entire five hours at the police station. *Id.*

Looking at the state trial court's decision with the presumption that it deserves,[17] Del Valle has failed to show that the state trial court's finding that defense trial counsel was not ineffective was unreasonable or contrary to clearly established federal law.  First, Del Valle has failed to show that the performance of defense trial counsel was deficient.  Here, defense trial counsel made a strategic decision regarding how to argue the Motion to Suppress.  Instead of focusing on Del Valle's testimony that he had been held in different rooms and he was not free to leave, defense trial counsel decided not to make Del Valle's credibility the focus of the Motion to Suppress. Rather, defense trial counsel decided to focus his argument on the fact that Del Valle's confession should be suppressed because he had invoked his rights three times during the interrogation.  Del Valle has not shown that defense trial counsel's strategic decision to focus on his invocation of his legal rights rather than on his experience during the interrogation was unreasonable or that no competent counsel would have made that same strategic decision.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); *Esposito v. Warden*, No. 15-11384, 2020 WL 3428937, at *7 (11th Cir. June 23, 2020) ("Counsel were permitted to make the strategic decision not to call an expert and instead challenge the state's forensic evidence through other means, and we cannot now second guess that strategy."); *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1299 (11th Cir. 2014) ("Counsel's strategic decision to have [the defendant] recount the murder in detail and demonstrate his strength to the jury was not objectively unreasonable."); *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 563–64 (11th Cir. 2009) ("If counsel made the decision not to call Washington for strategic reasons—if, for example, he spoke with Washington and decided

---

[17] "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct."  *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

that his testimony would not be helpful or that he would not make a credible witness—then this court would not provide relief for such strategic decisions by counsel."); *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [this Court] will seldom, if ever, second guess.") (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)); *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir. 1984) ("While attorneys may disagree as to how many or what particular witnesses to call, such is the stuff out of which trials are made.").

Second, as to the prejudice prong, Del Valle has failed to show that his testimony at the suppression hearing would have made a difference or change the outcome of the case. As the state trial court noted, the court was aware of the evidence that Del Valle claims he would have testified to because that evidence came to light during Del Valle's recorded statement and the cross-examination of Detectives Arango and Spitler by defense trial counsel. As such, Del Valle has failed to meet his high burden of showing that defense trial counsel was ineffective in failing to call him to testify at the Motion to Suppress hearing.

### 2. Del Valle's Defense Trial Counsel Was Not Ineffective In Deciding Not To Call Lazara Parets At The Motion To Suppress Hearing.

Del Valle also argues that defense trial counsel was ineffective in failing to call Lazara Parets at the Motion to Suppress hearing. ECF No. [51] at 62. According to Del Valle, Ms. Parets would have testified that "she was his sixteen-year-old girlfriend, she was brought to the police station with him, both of their personal property was taken from them (so they were not free to leave), and they were both placed in separate holding cells." *Id*. at 63. Del Valle also argues that Ms. Parets would have testified that she "saw Mr. Del Valle being moved from a holding cell to an office for the second interrogation which resulted in his statement, which was different from what the detective testified to (that Mr. Del Valle was kept in an office and was free to leave the

48

entire time)." *Id*. at 64.  Del Valle further alleges that "[s]he could have refuted the claim, based on her own interaction with the same detective, that Mr. Del Valle's second interaction with the police was the result of any voluntary decision by Mr. Del Valle, which went to the heart of the issue as to the motion to suppress." *Id*.

Respondent argues that defense trial counsel's decision not to call Ms. Parets as a witness at the Motion to Suppress hearing was based on defense trial counsel's strategic decision.  ECF No. [54] at 65–66.  First, Respondent argues that Ms. Parets was not present inside the interrogation room or present during the murder, thus defense trial counsel determined that she did not have firsthand knowledge about the specifics of the interrogation.  *Id*. at 66.  Second, Respondent argues that based on Ms. Parets' differing accounts of Del Valle's whereabouts, her credibility was questionable.  *Id*.  Thus, Respondent submits that defense trial counsel made a determination that Ms. Parets' testimony would hurt Del Valle.  *Id*.

During the hearing on Del Valle's Post-Conviction Motion, defense trial counsel testified that he asked Del Valle if he was still in contact with Ms. Parets, his girlfriend, at the time of the Motion to Suppress.  Defense trial counsel testified that he ultimately decided not to call Ms. Parets because since she had given differing accounts as to Del Valle's whereabouts on the date of the crime, her credibility would have been an issue.  ECF No. [13-12] at 74.  Ms. Parets originally told the police that Del Valle was with her at all times the night of the crime but later clarified that she had fallen asleep and did not know where Del Valle was for part of the night.  Here too, defense trial counsel testified that, similar to his decision not to call Del Valle to testify at the Motion to Suppress hearing, he decided not to make Del Valle's allegations that he had been in different rooms and that there were masked police officers, as corroborated by Ms. Parets, the focal point of his argument as to why Del Valle's confession should be suppressed.  *Id*.  at 75.

The trial court concluded that defense trial counsel "made a strategic decision based on witness credibility and made the arguments he felt he could legally make given the circumstances." *Id*. Indeed, the trial court specifically noted that it was not persuaded by Del Valle's argument that his girlfriend's testimony, in addition to his own, would have made a difference at the suppression hearing. *Id*. The trial court concluded that even if Ms. Parets testified, the outcome of the case would not have been different because the court was aware of the length of the interrogation, of Del Valle's age, and of the fact that Del Valle had been observed the entire five hours at the police station. *Id.* Thus, the trial court concluded that defense trial counsel was not ineffective. *Id*.

Del Valle has failed to show that the state trial court's finding that defense counsel was not ineffective was unreasonable or contrary to clearly established federal law. First, Del Valle has failed to show that the performance of defense trial counsel was deficient. Similar to his decision not to call Del Valle to testify at trial, defense trial counsel made the strategic decision not to make the credibility of Ms. Parets the focal point of the Motion to Suppress. Specifically, because Ms. Parets gave differing accounts about Del Valle's whereabouts, her credibility was highly questionable. Thus, defense trial counsel decided, based on his experience as a seasoned trial attorney, to focus his arguments on the Motion to Suppress on the fact that Del Valle had invoked his rights three times during the interrogation. In light of these facts, and for the same reasons previously noted with respect to defense trial counsel's decision not to call Del Valle at the Motion to Suppress hearing, defense trial counsel's strategic decision not to call Ms. Parets to testify at the Motion to Suppress hearing was not unreasonable. Likewise, as to the prejudice prong, Del Valle has failed to show that Ms. Parets' testimony at the suppression hearing would have made a difference or changed the outcome of the case. As the state trial court noted that at the suppression hearing, evidence was presented that Ms. Parets was at the police station. As such, Del Valle has

failed to meet his high burden of showing that defense trial counsel was ineffective in failing to call Ms. Parets to testify at the Motion to Suppress hearing.[18]

## V.    RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that Del Valle's Petition for Writ of Habeas Corpus, ECF No. [1], be **GRANTED IN PART AND DENIED IN PART**

## VI.    OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the District Court, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida on April 13, 2022.

_____
**JACQUELINE BECERRA**
**United States Magistrate Judge**

---

[18] Although Respondent argues that Del Valle himself failed to call Ms. Parets as a witness at the hearing on his Post-Conviction Motion and that he also made a "conscious decision not to call her either," ECF No. [54] at 70–71, the undersigned rejects that argument.  During the hearing on his Post-Conviction Motion, Del Valle explained that Ms. Parets was willing to testify at the post-conviction hearing but was not there that day because he himself did not know the hearing was happening.  ECF No. [51] at 63.  Indeed, during the hearing, the clerk stated that there was no notice that the hearing was happening that day.  *Id*.  Although the undersigned does not fault Del Valle for not calling Ms. Parets to testify at the post-conviction hearing, Del Valle's claim that defense trial counsel was ineffective still fails for the reasons previously noted.